UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOHN ANTHONY BUNCH,

Petitioner,

v.

D. SAMMULES,

Respondent.

No.  2:21-cv-01209 DAD KJN P

ORDER &

FINDINGS & RECOMMENDATIONS

I.  Introduction

Petitioner John Anthony Bunch is a state prisoner, proceeding without counsel, with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his May 16, 2017 conviction for first degree murder with felony-murder special circumstance and possession of firearm.  Petitioner was sentenced to life without parole in state prison.  Petitioner now raises the following claims:  (1) insufficient evidence to support his felony murder conviction; (2) insufficient evidence to support the firearm possession offense; (3) the trial court violated his due process rights by denying his Marsden[1] motion; and (4) prosecutorial misconduct.  (ECF No. 1.)  After careful review of the record, this Court concludes that the petition should be denied.  This Court also orders that petitioner's request for appointment of

_____

[1] People v. Marsden, 2 Cal. 3d 118 (1970).

1

1    counsel (ECF No. 20) is denied without prejudice.

2    II.  Procedural History

3            On May 16, 2017, a jury found petitioner guilty of first degree murder during the special

4    circumstance of an attempted robbery and being a felon in possession of a firearm.  (ECF No. 14-

5    15 at 149-50.)  On June 30, 2017, petitioner was sentenced to life without parole in state prison.

6    (Id. at 184-85.)

7            Petitioner appealed the conviction to the California Court of Appeal, Third Appellate

8    District.  (ECF No. 14-2.)  The Court of Appeal affirmed the conviction on May 4, 2020.  (ECF

9    No. 14-1.)  Petitioner filed a petition for review in the California Supreme Court, which was

10   denied in July 2020.  (ECF Nos. 14-8 & 14-9.)  He did not file a state habeas petition.

11           Petitioner filed the instant petition on June 15, 2021.  (ECF No. 1.)  Despite attaching his

12   petition for review filed in the California Supreme Court to his habeas petition, petitioner raises

13   only four of the seven claims he raised in state court.  (Id.; see also ECF No. 20 at 5 (petitioner

14   stating in traverse that he "challenges the denial of four of his direct appeal claims….")

15   Respondent filed an answer.  (ECF Nos. 13 & 14.)  Petitioner filed a traverse.  (ECF No. 20.)

16   III.  Facts[2]

17           After independently reviewing the record, this Court finds the appellate court's summary

18   accurate and adopts it herein.  In its unpublished memorandum and opinion affirming petitioner's

19   judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District

20   provided the following factual summary:

21               On September 28, 2015, Gibson worked as a maintenance supervisor at a
                 winery. On the side, Gibson grew medical marijuana plants. Before 5:30
22               p.m. that day, a cellphone that was assigned the number (510) 355-7414
                 (defendant's phone)[3] connected with cell reception towers in Oakland.
23               Between 4:30 p.m. and 5:30 p.m., another cellphone assigned the number
                 (510) 640-3311 (the 3311 phone) connected with the same cell tower in
24               Oakland as defendant's phone.

25               [N.3 Evidence at trial connected defendant with the cellphone assigned
                 the number (510) 355-7414. The receipt for the purchase of this cellphone
26

27   ─────────────────────
     [2]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate
     District in People v. Bunch, No. C085051, 2020 WL 2110169 (Cal. Ct. App. May 4, 2020),
28   which respondent lodged as ECF No. 14-1.

                                                    2

-- a white iPhone -- from MetroPCS was found in defendant's wallet along with his social security card, a photo identification card, and a business card with defendant's name on it. The police recovered the wallet from a silver BMW parked outside the emergency room where defendant sought treatment for a gunshot wound to his leg. Defendant's cellphone was also recovered from the BMW.]

Over the course of the day on September 28, 2015, defendant's and the 3311 phones traveled simultaneously from Oakland to San Francisco to Vallejo to Davis to Sacramento.

That afternoon, Gibson met with a marijuana-sales customer, W.C., who related he had been robbed of his marijuana in July 2015. W.C. described the robbers as two male Black adults with dreadlocks who drove a blue Mercedes. The robbers took W.C.'s marijuana at gunpoint at their meeting location on Hurley and Fulton Avenues in Sacramento. W.C. warned Gibson "to be careful." Regarding W.C.'s testimony on this point, the trial court informed the jury: "'The parties agree and stipulate that with respect to the earlier robbery suffered by William W.C. a few months prior to [Gibson]'s death' -- that is referring to the Hurley location incident -- '[defendant] was not in Sacramento at the time of the incident and was not one of the two suspects.'"

On the evening of September 28, 2015, Gibson went to the Natomas Walmart parking lot to conduct a marijuana sale. Gibson took approximately two pounds of marijuana with him in a five-gallon bucket. Gibson had listed the marijuana for sale in an online ad for $100 per ounce.

Around 7:00 p.m., Gibson called his wife from a fast food restaurant and told her he would be home soon.

Video taken at the Carquinez Bridge tollbooth appeared to show defendant in the passenger seat of a charcoal gray BMW with a red racing stripe (the red racing stripe BMW)[4] driving toward Sacramento at 7:30 p.m. Defendant was wearing white pants. Surveillance video would later capture images of defendant wearing white pants after sustaining a gunshot wound to the leg.

[N.4 This case involves two BMW sedans. The evidence showed the red racing stripe BMW was driven to Sacramento while occupied by defendant. The second BMW, a silver model, would later be found outside San Francisco General Hospital where defendant was admitted to the emergency room.]

At 8:30 p.m., T.G. was outside a PetSmart store on Truxel Avenue in Natomas. She saw two cars parked with the driver-side windows facing toward each other. One of the cars belonged to Gibson, and the other was a dark color car. T.G. heard someone yell, "No. No. No. What's this? Hell no. Fuck this shit. Nope. This isn't happening." The argument was between two male voices. When asked about the argument, T.G. testified: "Just a lot of angry, you know -- you really want my opinion? It sounded like a deal gone bad." T.G. then heard, "pop-pop-pop." She saw a flash come from the driver's side of the dark color car. She saw a male in his early 20s with dark, long hair come running out of the passenger side of

one of the vehicles and into the garden section of a Home Depot. This male appeared to stumble or limp. He looked over his shoulder and said, "Oh shit."

At that time, A.J. was working in the same shopping center parking lot as a cart collector for Walmart. He saw two cars parked next to each other in close proximity. One was a white Scion with the driver's side door open and the other was possibly a gray Mercedes. A man was standing next to the Scion. A dark-skinned man was standing next to the passenger door of the other vehicle. A.J. observed this dark-skinned man "reaching into the passenger door of the white car." The bucket containing marijuana was on the floor next to the front passenger seat in Gibson's Scion. The person next to the Scion "ran about five or eight feet." A.J. then saw that another "individual raised his hands up in front of him, as if in a shooting position." Although A.J. could not see anything in the hands of the man from his distance, "it was at that point in time that [A.J.] hear[d] gunshots." A.J. also saw a flash. When he heard gunshots, A.J. ducked behind a car. He heard the other man who was standing next to the Scion yell, "Help." After the gunfire, he saw a car "peel out" and leave.

D.N. was in the same parking lot in front of the Home Depot at 8:30 that night. She heard shots. Shortly thereafter she saw a man running toward a vehicle in front of the Home Depot store. The man who ran had a limp that "looked like it was painful." D.N. assumed he was bleeding. The man jumped into a dark color four-door sedan.

P.S. was also in that shopping center parking lot at 8:30 p.m. His girlfriend was reversing their car when he heard gunshots. P.S. "go[es] shooting a fair amount" and immediately recognized the sounds as gunshots. He looked in the direction of the shooting and saw "one individual trying to fire a gun at another individual." There was a vehicle between them. P.S. thought he might have seen someone get shot three times and fall backward. P.S. also saw someone else outside the white car who was shooting.

Gibson died of gunshot wounds caused by three to six bullets -- the exact number was difficult to determine because bullets could have exited and reentered the body. Gibson died at the scene. His gun was found near his body.

Telephone records showed that shortly before the shooting, the 3311 phone contacted Gibson's cell phone. After Gibson was shot, defendant's cellphone and the 3311 phone traveled in tandem back to Oakland.

Defendant's cellphone connected with three cellphone towers in San Francisco shortly after 10:00 p.m. At 10:46 p.m., defendant's cellphone connected with a tower near San Francisco General Hospital.

The parties stipulated that:

• San Francisco Police Department Officer Jennifer Foxworth was dispatched to San Francisco General Hospital at 10:55 p.m.

• Foxworth obtained gunshot residue from defendant's hands.

4

• The silver BMW was parked near the emergency room entrance.

• The following were found inside the silver BMW: a wallet containing documents in defendant's name, a white iPhone, a live .9 millimeter round inside the front passenger door compartment, a live .9 millimeter round underneath the gas pedal.

Testimony also established the police found a locked BLU cellphone in the silver BMW.

Sacramento County Police Department Detective Jason Kirtlan interviewed defendant in the recovery area of the hospital at noon on September 29, 2015. Defendant had gunshot wounds to his right arm and left knee. Defendant was quite groggy at the time, and the detective offered to come back later. However, defendant agreed to talk. Initially, defendant said "that the injury he had was from being shot in San Francisco." Then defendant "said he wasn't sure." Clothes collected from defendant on his admission to the hospital were a white shirt and black shorts, but no white pants. Bullet fragments removed from defendant's body during surgery were consistent with bullets test-fired from Gibson's gun. Defendant's gunshot wound to his leg was consistent with the blood stain shown on the perpetrator's leg in surveillance video taken from the scene of the shooting.

On October 25, 2015, a police officer saw the red racing stripe BMW parked behind a residence at 963 Center Street, Apartment A, in Oakland. A warrant was obtained, and the vehicle was searched. Several bullets were observed to have hit the vehicle. Bullet fragments retrieved from the BMW were consistent with those fired from Gibson's gun. Partial DNA profiles from swabs taken of what appeared to be blood found in the front passenger area of the BMW were "consistent with the genotypes at all the different markers" of defendant. The red racing stripe BMW also had numerous pieces of paper in it with Brown's name on them.

(ECF No. 14-1 at 3-8); People v. Bunch, No. C085051, 2020 WL 2110169, at *2-3 (Cal. Ct. App. May 4, 2020).

IV.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in

5

custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of applying § 2254(d)(1), "clearly established Federal law" consists of holdings of the Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 133 S. Ct. 1446, 1450 (2013) (citing Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Id. Further, where courts of appeals have diverged in their treatment of an issue, there is no "clearly established federal law" governing that issue. See Carey v. Musladin, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme

Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case."[3]
Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); see also Chia v.
Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, "a federal habeas court may not issue
the writ simply because that court concludes in its independent judgment that the relevant state-
court decision applied clearly established federal law erroneously or incorrectly.  Rather, that
application must also be unreasonable."  Williams, 529 U.S. at 411; see also Schriro v. Landrigan,
550 U.S. 465, 473 (2007); Lockyer, 538 U.S. at 75 ("It is not enough that a federal habeas court,
in its 'independent review of the legal question,' is left with a '"firm conviction"' that the state
court was '"erroneous"'").  "A state court's determination that a claim lacks merit precludes
federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state
court's decision."  Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v.
Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for obtaining habeas corpus
from a federal court, a state prisoner must show that the state court's ruling on the claim being
presented in federal court was so lacking in justification that there was an error well understood
and comprehended in existing law beyond any possibility for fair-minded disagreement."  Id. at
103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing
court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford,
527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008)
(en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of
§ 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by
considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court
judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).
If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

---

[3]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
presented in the state court proceeding."  Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,
384 F.3d 628, 638 (9th Cir. 2004)).

previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Richter, 562 U.S. at 99.  This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely."  Id. at 99-100.  Similarly, when a state court decision on petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, 568 U.S. 289, 298-301 (2013) (citing Richter, 562 U.S. at 98).  If a state court fails to adjudicate a component of the petitioner's federal claim, the component is reviewed de novo in federal court.  See, e.g., Wiggins v. Smith, 539 U.S. 510, 534 (2003).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no reasoned decision is available, the habeas petitioner has the burden of "showing there was no reasonable basis for the state court to deny relief."  Richter, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims.  Stancle v. Clay, 692 F.3d 948, 957 & n.3 (9th Cir. 2012).  While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court reviews the state court record to "determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court."  Richter, 562 U.S. at 101.  It remains the petitioner's burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'"  Walker v. Martel, 709 F.3d 925, 939

8

1   (9th Cir. 2013) (quoting <u>Richter</u>, 562 U.S. at 98).

2          When it is clear, however, that a state court has not reached the merits of a petitioner's

3   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

4   habeas court must review the claim de novo.  <u>Stanley</u>, 633 F.3d at 860 (citing <u>Reynoso v.</u>

5   <u>Giurbino</u>, 462 F.3d 1099, 1109 (9th Cir. 2006)).

6   V.  <u>Petitioner's Claims</u>

7          A.  <u>Claim One: Sufficiency of the Evidence</u>

8          Petitioner claims that the record fails to provide substantial evidence to support the true

9   finding of a felony murder special circumstance.  (ECF No. 1 at 20-23.)  He argues that there is

10  insufficient evidence that he attempted a robbery, was present at the crime scene, or possessed a

11  firearm.  In response, respondent argues that the state court's rejection of the insufficient evidence

12  of felony murder special circumstance claim was reasonable.  (ECF No. 13 at 13-16.)

13         In the last well-reasoned opinion, the state appellate court evaluated and rejected

14  petitioner's claim.

15                                              **A.**

16                          ***Substantial Evidence Standard of Review***

17              Under the substantial evidence standard of review, we view the
            record in the light most favorable to the verdict. (*People v.*
18          *Smith* (2005) 37 Cal.4th 733, 738-739.) "In reviewing a sufficiency
            of evidence claim, the reviewing court's role is a limited one. ' "The
19          proper test for determining a claim of insufficiency of evidence in a
            criminal case is whether, on the entire record, a rational trier of fact
20          could find the defendant guilty beyond a reasonable doubt.
            [Citations.] On appeal, we must view the evidence in the light most
21          favorable to the People and must presume in support of the judgment
            the existence of every fact the trier could reasonably deduce from the
22          evidence." ' ' "

23              " ' "Although we must ensure the evidence is reasonable, credible,
            and of solid value, nonetheless it is the exclusive province of the trial
24          judge or jury to determine the credibility of a witness and the truth
            or falsity of the facts on which that determination depends.
25          [Citation.] Thus, if the verdict is supported by substantial evidence,
            we must accord due deference to the trier of fact and not substitute
26          our evaluation of a witness's credibility for that of the fact finder." '
            " (*People v. Smith*, *supra*, at pp. 728-739, quoting *People v.*
27          *Ochoa* (1993) 6 Cal.4th 1199, 1206.)

28                                              **B.**

                                              9

### *Sufficiency of the Evidence for Attempted Robbery*

As the California Supreme Court has explained, "An attempted robbery requires a specific intent to commit robbery and a direct, ineffectual act (beyond mere preparation) toward its commission. ([*People v.*] *Dillon* [ (1983) ] 34 Cal.3d [441,] 455-456; *People v. Vizcarra* (1980) 110 Cal.App.3d 858, 861.) Under general attempt principles, commission of an element of the crime is not necessary. (See *ante*, at [p. 693].) As such, neither a completed theft (*People v. Bonner* (2000) 80 Cal.App.4th 759, 764) nor a completed assault (see *Vizcarra, supra*, 110 Cal.App.3d at pp. 862-863), is required for attempted robbery." (*People v. Medina* (2007) 41 Cal.4th 685, 694–695 (*Medina*).)

Here, defendant argues the evidence showed "[n]o eyewitness reported hearing words indicating a robbery or attempted robbery occurred." And defendant points out that Gibson's marijuana and $1,200 in his wallet were not taken. We reject the argument.

Gibson told his wife he was going to the shopping center to sell marijuana. He took two pounds of marijuana with him. At the shopping center, he met with defendant and Brown. A loud and angry exchange ensued, and defendant was seen by an eyewitness reaching into the passenger side of Gibson's vehicle -- right where Gibson had the marijuana. The reasonable inference is that defendant and Brown attempted to rob Gibson of his marijuana at gunpoint. T.G.'s testimony confirms this inference in that she said it "sounded like a deal gone bad." Defendant cites no authority in support of the proposition that evidence of the exact language employed during a robbery is required for conviction. In any event, we reject the proposition because robbery may be committed without the exchange of any words. (See, e.g., *People v. Burns* (2009) 172 Cal.App.4th 1251, 1255, 1259 [affirming robbery conviction where purse was taken with force but without any words used by the defendant in committing the offense].)

The fact defendant and Brown did not get away with Gibson's marijuana or cash does not render the evidence insufficient for an *attempted* robbery. A direct but ineffectual act of the theft suffices for an attempted robbery conviction. (*Medina*, *supra*, 41 Cal.4th at pp. 694-695.) Defendant's reaching into Gibson's vehicle toward the bucket of marijuana constitutes a direct but ineffectual act of attempted robbery. That defendant left the marijuana and cash behind when the shooting started does not negate the attempted robbery. (*Ibid*.)

### C.

### *Sufficiency of the Evidence for Special Circumstance Felony Murder*

Defendant next advances a related claim. He argues that the lack of substantial evidence in support of the attempted robbery requires reversal of the special circumstance felony murder because the murder conviction was based on the commission of the murder

10

during the attempted robbery. Having rejected defendant's challenge to the sufficiency of the evidence of attempted robbery, we also reject this argument in light of the substantial evidence of the attempted robbery.

### D.

### *Murder*

Defendant next argues, "[t]he evidence does not support a finding that [he] was the killer." In support of this argument, defendant points out there was no evidence he possessed a gun and his clothes at the hospital did not match those in the surveillance tape at the murder scene. We are not persuaded by the argument.

A conviction for felony murder may be supported by proof of an attempt to commit a felony that is inherently dangerous to human life. (*People v. Dillon* (1983) 34 Cal.3d 441, 453.) In *Dillon*, the high court held that attempted robbery constitutes a felony that is inherently dangerous to human life and that supports a felony murder conviction. (*Id.* at p. 455.) The felony murder in *Dillon* involved an attempt by the defendant and his companions to rob a marijuana farm. (*Id.* at p. 455.) The Supreme Court held that the defendants in that case "must have known they would probably be required to use force to reach their goal" because they armed and disguised themselves, made their way past "no trespassing" signs, and carried "means of forcibly subduing any opposition." (*Id.* at p. 456.)

A person may be convicted of felony murder even without committing the fatal act him or herself because "a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) "Aider-abettor liability exists when a person who does not directly commit a crime assists the direct perpetrator by aid or encouragement, with knowledge of the perpetrator's criminal intent and with the intent to help him [or her] carry out the offense. (*People v. Beeman* (1984) 35 Cal.3d 547, 560-561.) '[W]hile mere presence at the scene of an offense is not sufficient in itself to sustain a conviction, it is a circumstance which will tend to support a finding that an accused was a principal. [Citations.]' (*People v. Laster* (1971) 18 Cal.App.3d 381, 388.) ' "[C]ompanionship, and conduct before and after the offense" ' are also relevant to determining whether a defendant aided and abetted a crime." (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407.)

As in *Dillon, supra*, 34 Cal.3d 441, the evidence shows defendant and Brown armed themselves and acted in concert in attempting to steal marijuana. (Cf. *id.* at pp. 453-455.) Defendant and Brown traveled from Oakland to Sacramento together in the same vehicle. They brought a gun along to facilitate the robbery.[5] Defendant was the one who attempted the theft by reaching into Gibson's vehicle where the marijuana was located. At the same time, Brown pointed the gun at Gibson. After the murder, defendant and Brown got back into the same car and returned to Oakland together. Substantial evidence showed defendant to be acting in concert to accomplish the

1    attempted robbery that resulted in Gibson's death.

2        [N.5 We separately address defendant's contention he did not
         possess a firearm in part I E., below.]
3
         Defendant's assertion that the evidence was insufficient to place him
4        at the scene of the murder is refuted by the record. Defendant's
         cellphone traveled from the Bay Area to the scene of the attempted
5        robbery/murder. Surveillance cameras captured images of defendant
         running through the parking lot after the shooting while wearing the
6        same white pants he wore when crossing the Carquinez Bridge on
         the way to Sacramento. The surveillance footage also showed
7        defendant with a wound to his leg that matched the
         gunshot wound for which he was treated at the hospital. His
8        movement from the scene of the murder to the hospital was tracked
         by his cellphone as it traveled from Sacramento to the cellphone
9        tower nearest San Francisco General Hospital. Blood found inside
         the red racing stripe BMW was consistent with defendant's blood.
10
         In short, the evidence established defendant traveled to Sacramento
11       with Brown to rob Gibson at gunpoint. Defendant attempted to take
         the marijuana while Brown pointed a gun. The record shows they
12       acted in concert from the time they started traveling to Sacramento
         from Oakland to the time when they returned to Oakland. Defendant
13       acted with the necessary mental state for the attempted robbery and
         is therefore guilty of Gibson's murder.
14

15   (ECF No. 14-1 at 8-13.)

16       A petitioner is entitled to habeas corpus relief on a sufficiency of the evidence claim, "if it

17   is found that upon the record evidence adduced at the trial no rational trier of fact could have

18   found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979);

19   see also Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011).  This inquiry involves two steps.

20   First, the federal court must review the evidence in the light most favorable to the prosecution.

21   Jackson, 443 U.S. at 319.  If there are conflicting factual inferences, the federal court must

22   presume the jury resolved the conflicts in favor of the prosecution.  Id. at 326 ("[A] federal

23   habeas corpus court faced with a record of historical facts that supports conflicting inferences

24   must presume—even if it does not affirmatively appear in the record—that the trier of fact

25   resolved any such conflicts in favor of the prosecution, and must defer to that resolution.");

26   McDaniel v. Brown, 558 U.S. 120, 133 (2010) (per curiam).  Second, the federal court will

27   "determine whether the evidence at trial, including any evidence of innocence, could allow *any*

28   rational trier of fact to find the essential elements of the crime beyond a reasonable doubt."

                                                    12

1   United States v. Nevils, 598 F.3d 1158, 1165 (9th Cir. 2010) (en banc).

2          Although this Court's review is grounded in due process under the Fourteenth

3   Amendment, the Jackson standard "must be applied with explicit reference to the substantive

4   elements of the criminal offense as defined by state law."  Jackson, 443 U.S. at 324 n.16; Juan H.

5   v. Allen, 408 F.3d 1262, 1275-76 (9th Cir. 2005).  This Court will look to state law to establish

6   the elements of the offense and then turn to the federal question of whether the state court was

7   objectively unreasonable in concluding that sufficient evidence supported that conviction.  See

8   Johnson v. Montgomery, 899 F.3d 1052, 1056 (9th Cir. 2018).

9          "After AEDPA, we apply the standards of Jackson with an additional layer of deference."

10  Juan H., 408 F.3d at 1274; see Coleman v. Johnson, 566 U.S. 650, 651 (2012) (per curiam).  On

11  direct appeal at the state level, "it is the responsibility of the jury—not the court—to decide what

12  conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the

13  jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have

14  agreed with the jury."  Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam).  On habeas review,

15  "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence

16  challenge simply because the federal court disagrees with the state court.  The federal court

17  instead may do so only if the state decision was 'objectively unreasonable.'"  Id. (quoting

18  Renico v. Lett, 559 U.S. 766, 773 (2010)).

19         Here, petitioner challenges whether there is sufficient evidence to support attempted

20  robbery, murder conviction, and a true finding of felony-murder special circumstance.  As to

21  attempted robbery, California law requires proof that defendant took a direct but ineffective step

22  toward committing robbery and that he intended to commit robbery.  (ECF No. 14-15 at 135);

23  People v. Dillon, 34 Cal. 3d 441, 452 (1983).  Petitioner's sole argument is that there is

24  insufficient evidence of attempted robbery because the victim's marijuana and $1,200 was left

25  behind and he did not take anything from the victim.  After reviewing the record, this Court

26  determines that the state court reasonably concluded that "[d]efendant's reaching into Gibson's

27  vehicle toward the bucket of marijuana constitutes a direct but ineffectual act of attempted

28  robbery.  That defendant left the marijuana and cash behind when the shooting started does not

13

1   negate the attempted robbery." (ECF No. 14-1 at 10.) As the state court noted, the victim's wife

2   testified that her husband was going to sell marijuana in a Walmart parking lot in Natomas that

3   evening. (ECF No. 14-10 at 131.) There was evidence that, before the shooting, a man reached

4   into the passenger side door of the victim's car and there was a loud argument. (ECF No. 14-11

5   at 27-29, 37-39, 69-77.) It was not objectively unreasonable for the state court to conclude that

6   "[t]he reasonable inference is that defendant and Brown attempted to rob Gibson of his marijuana

7   at gunpoint." (ECF No. 14-1 at 10.)

8         Next, petitioner claims that there is insufficient evidence for the special circumstance of

9   felony murder. Because the special circumstance of felony murder is related to the attempted

10   robbery evidence, the state court reasonably concluded that this claim must also fail.

11         Lastly, petitioner contends that there was insufficient evidence that he killed the victim.

12   He claims that there is no evidence that he possessed the gun or wore the same clothes as the

13   suspect in the crime scene surveillance video. To prove that defendant is guilty of felony murder,

14   the state had to prove that defendant attempted and intended to commit robbery and, during the

15   commission of that felony, caused the death of another person. (ECF No. 14-1 at 11; ECF No.

16   14-15 at 133); Dillon, 34 Cal. 3d at 462. Under California law, a defendant may be convicted

17   under a theory of aiding and abetting a felony murder even if another person (the perpetrator) did

18   the act that resulted in death. (ECF No. 14-1 at 11); People v. McCoy, 25 Cal. 4th 1111, 1117

19   (2001). Under this theory, the state had to prove that (1) defendant attempted to commit, or aided

20   and abetted, robbery, (2) defendant intended to commit, or aid and abet the perpetrator in

21   committing, robbery, and (3) if defendant did not intend to commit robbery, then the perpetrator

22   whom defendant aided and abetted committed or attempted to commit robbery, and (4) while

23   attempting to commit robbery, the defendant or the perpetrator caused the death of another

24   person. (ECF No. 14-15 at 134); People v. Clark, 63 Cal. 4th 522, 615 (2016). Based on the trial

25   evidence, the state court's rejection of petitioner's argument was objectively reasonable. The

26   state court accurately summarized the evidence that petitioner traveled to Sacramento with Brown

27   to rob Gibson, attempted to take Gibson's marijuana while Brown pointed the gun at him, and

28   returned to the Bay Area together after the shooting. (ECF No. 14-1 at 12-13; ECF No. 14-10 at

14

237-42, 321-22; ECF No. 14-11 at 37-40, 52, 63, 68-75, 91-100, 114-18, 126-31, 136-38, 145-49, 160-67, 206-16.)  Petitioner acknowledges that the bullet fragments removed from his leg and found in Brown's BMW were consistent with having been fired from Gibson's gun.  (ECF No. 1 at 16; ECF No. 14-10 at 278-88.)  And that his DNA profile was consistent with partial DNA recovered from Brown's BMW.  (ECF No. 1 at 16; ECF No. 14-12 at 18-19.)

In the traverse, petitioner identifies evidence that was lacking in the trial record including: (1) identity evidence was not overwhelming; (2) no eyewitness identified petitioner; (3) no evidence the petitioner fired a gun; (4) petitioner's clothing from hospital did not match those on surveillance video; (5) Carquinez Bridge toll booth did not show petitioner; (6) surveillance video from crime scene does not show suspect's facial features; and (7) petitioner's DNA was not in Gibson's car.  (ECF No. 20 at 7-8.)  When reviewing petitioner's sufficiency of evidence claim, this Court must review the evidence in the light most favorable to the prosecution.  Jackson, 443 U.S. at 319.  On direct review, the state appellate court could only have set aside the jury's verdict if no rational trier of fact could have agreed with the verdict.  Cavazos, 565 U.S. at 2. Now on habeas review, this Court cannot overturn a state court's decision rejecting the sufficiency of the evidence claim unless the state court's decision was objectively unreasonable. Id.  Given the evidence of petitioner's guilt as described above, this Court concludes that the state court's finding that there was sufficient evidence to support the conviction was not contrary to, or an unreasonable application of, clearly established federal law, or that such a finding was based on an unreasonable application of the facts.  This Court recommends denying habeas relief on this claim.

B. Claim Two: Sufficiency of Possession of Firearm Offense

Petitioner claims that the state court erred in deciding that there was sufficient evidence to support his conviction for felon in possession of a gun.  (ECF No. 1 at 23-24.)  In response, respondent argues that rejection of petitioner's insufficient evidence of possession claim provides no basis for habeas relief.  (ECF No. 13 at 16-18.)

The state court reviewed the argument and denied relief.

////

### *Substantial Evidence of Possession of Firearm*

Defendant next argues the evidence was insufficient to prove he possessed a gun in the commission of the attempted robbery and murder. Defendant largely premises the argument on the fact no eyewitness saw *him* holding a gun. We reject the argument.

### A.

### *Section 29800*

Section 29800, subdivision (a)(1), provides that "[a]ny person who has been convicted of ... a felony ... and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony." Constructive possession of a firearm suffices under section 29800. (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 831.) "Constructive possession means the object is not in the defendant's physical possession, but the defendant knowingly exercises control or the right to control the object. (*People v. Pena* (1999) 74 Cal.App.4th 1078, 1083-1084.) Possession of a weapon may be proven circumstantially, and possession for even a limited time and purpose may be sufficient." (*Ibid.*) As defendant acknowledges, "Firearm-possession may be proved by evidence of joint dominion and control over a firearm." (*People v. Nieto* (1966) 247 Cal.App.2d 364, 366-367.)

### B.

### *Defendant's Constructive Possession of Firearm*

The evidence supported defendant's conviction of being a felon in possession of a firearm based on a theory of constructive possession. The parties stipulated at trial that defendant was a convicted felon at the time of Gibson's murder. And testimony at trial established defendant's constructive possession of the firearm that killed Gibson.

Forensic evidence showed Gibson died of multiple gunshot wounds he received at the scene of his meeting with defendant and Brown. A.J. – who was only 40 feet away – saw Brown making a pointing motion at Gibson immediately before he saw flashes and heard gunshots. Brown shot Gibson at almost exactly the same time as defendant attempted to steal Gibson's marijuana. As we explained in part I D., above, defendant and Brown acted in concert in attempting to rob Gibson at gunpoint. The evidence also established Gibson's fatal wounds were caused by the same type of bullet found in the red racing stripe BMW in which defendant was riding on the way to the murder scene. The reasonable inference is that defendant knew they had a firearm in the vehicle when he and Brown drove together to Sacramento. Moreover, it is also a reasonable inference defendant and Brown coordinated their attempt to steal Gibson's marijuana by having Brown point the gun at Gibson while defendant was responsible for taking the marijuana. In carrying out the armed robbery attempt on Gibson, defendant had constructive possession of the firearm.

1
2
3
4
5

> Defendant's constructive possession of the firearm renders irrelevant his assertion that no one saw him holding a gun. He constructively possessed the firearm when acting in a coordinated robbery attempt on Gibson with Brown. (*People v. Nieto*, *supra*, 247 Cal.App.2d at pp. 366-367.) So too, the fact the murder weapon was never found does not undermine the evidence showing Brown killed Gibson by firing multiple times at Gibson. Defendant's conviction of section 29800 is supported by substantial evidence.

6   (ECF No. 14-1 at 13-15.)

7          As stated above, petitioner is entitled to relief on his sufficiency of evidence claim only "if

8   it is found that upon the record evidence adduced at the trial no rational trier of fact could have

9   found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979).

10  Petitioner has not made that showing.  Instead, the state court reasonably determined that there

11  was sufficient evidence to support the firearm possession conviction based on constructive

12  possession.  (ECF No. 14-1 at 14-15.)  As the state court noted, based on the trial evidence, the

13  jury could reasonably infer that Brown and petitioner acted in concert when they drove to

14  Sacramento to meet Gibson, and Brown shot Gibson at the same time petitioner attempted to steal

15  marijuana from Gibson's vehicle.  (Id.)

16         Petitioner contends that nobody saw him hold a gun, there was no evidence that the gun

17  was visible in the BMW, no one testified that they saw petitioner in the BMW, and surveillance

18  video does not show anyone in Brown's car that evening.  (ECF No. 1 at 23-24.)  At best,

19  petitioner's argument suggests that the evidence could have supported conflicting inferences.  On

20  habeas review, however, this Court "must presume—even if it does not affirmatively appear in

21  the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must

22  defer to that resolution." Jackson, 443 U.S. at 326.  In doing so, this Court concludes that the

23  state court's rejection of this sufficiency of the evidence claim was not contrary to, or an

24  unreasonable application of, clearly established federal law, or that such a finding was based on

25  an unreasonable application of the facts.  This Court recommends denying habeas relief on this

26  claim as well.

27         C. Claim Three: Denial of Marsden Motion

28         Next, petitioner challenges the state court's denial of his request for substitute counsel.

17

(ECF No. 1 at 31-33.)  He claims that his counsel provided ineffective assistance of counsel by failing to suppress pretrial statements he made while in the hospital.  In response, respondent argues that even if construed as an ineffective assistance of counsel claim and substitute-counsel claim, there is no basis for relief.  (ECF No. 13 at 18-23.)

In the last well-reasoned opinion, the state court evaluated and denied the claim as follows:

> Defendant argues the trial court committed reversible error by denying his *Marsden* motion "challenge to [defendant's trial] counsel's failure to challenge a statement obtained by exploiting apparent post-operative incapacitation."
>
> This argument invites multiple layers of analysis. The trial court erred in denying the *Marsden* motion if defendant showed he received ineffective assistance of counsel. (*People v. Watts* (2018) 22 Cal.App.5th 102, 117 (*Watts*) [trial court should consider post-trial claim of ineffective assistance of counsel].) Defendant received ineffective assistance of counsel if conduct by defendant's trial attorney, Pete Harned, fell below the standard and was prejudicial. (*Ibid.*) Defendant's trial attorney's conduct fell below the standard if an objection to defendant's statements in the hospital could have been suppressed and there was no rational tactical purpose for not making a suppression motion. (*Id.* at p. 118.) Defendant can show his statements to the officers in the hospital should have been suppressed if defendant's will was overborne so that his statements were not voluntary. (*People v. Perdomo* (2007) 147 Cal.App.4th 605, 616 (*Perdomo*).)
>
> We conclude defendant cannot demonstrate prejudice even if his trial attorney should have moved to suppress defendant's statements to the police while in the hospital. Accordingly, the trial court did not err in denying the *Marsden* motion.
>
> ### A.
>
> #### *Defendant's Motion*
>
> After the jury convicted defendant, he made a *Marsden* motion. During the hearing, defendant asserted that his trial attorney had been ineffective, among other reasons, for failure to make a motion to suppress his statements to the police while he was in the hospital. Given the opportunity to respond to defendant's motion, defendant's trial attorney stated: "With regard to the critical motion I didn't file, I did not feel that a Miranda motion was appropriate regarding [defendant's] statement, which, by the way, was introduced by the Prosecution, as the Court noted, not by me. I would not have introduced it at all, were it my choice. But [defendant] was not under arrest at the time. He was not in custody, therefore, I saw no grounds to file the Miranda motion. [¶] He was under the influence of narcotics from the surgical procedure, which is not a

basis to exclude the statement. It is, I think, an issue ... regarding the weight and how it should be interpreted. I used that, I hoped to my advantage, to establish that he was intoxicated, didn't understand what he was being asked and had he been more sober or coherent, he probably could have addressed things. That's how I handled that."

The trial court denied the motion, finding defense counsel had done "everything he possibly could have" done for defendant. The trial court also found defendant had not shown a breakdown in the attorney-client relationship that warranted substitution of appointed counsel.

## B.

### *Right to Effective Assistance of Counsel*

Indigent criminal defendants are entitled to competent legal representation by their appointed counsel. (*People v. Smith* (1993) 6 Cal.4th 684, 690 (*Smith*).) If a defendant moves to substitute appointed counsel based on ineffective assistance, "substitute counsel should be appointed when, and only when, necessary under the *Marsden* standard, that is whenever, in the exercise of its discretion, the court finds that the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel (*People v. Webster* [ (1991) ] 54 Cal.3d [411,] 435), or, stated slightly differently, if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result ...." (*Smith*, *supra*, at p. 696.)

As the California Supreme Court has explained, "To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. (*Strickland* [*v. Washington* (1984) 466 U.S. 668,] 687–688, 693 [ (*Strickland*) ]; [*People v.*] *Ledesma* [ (1987) 43 Cal.3d 171,] 216 [ (*Ledesma*) ].) Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. (*Strickland*, at pp. 687–688.) Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. (*Id*. at pp. 693–694.)" (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93.)

## C.

### *Analysis*

Even assuming defendant's statements in the hospital were involuntary, we conclude their admission was harmless.

At the *Marsden* hearing, Harned explained he did not move to suppress defendant's statement to the police while in the hospital because defendant was not in custody at the time and he voluntarily agreed to talk. In *Perdomo, supra,* 147 Cal.App.4th 605, the Court

of Appeal held admissible statements that a defendant made to police while lying in the intensive care unit of a hospital while receiving morphine and a sedative. (*Id.* at p. 616.) The *Perdomo* court affirmed the admissibility of the statements in that case even though, "[a]ccording to the interrogating officers, [the defendant] appeared to be in pain and also appeared to still be under the influence of the narcotic pain medication." (*Ibid.*) The evidence showed the defendant in *Perdomo* was lucid and understood the nature of the statements he made to the police. (*Ibid.*) The *Perdomo* court noted, however, it is possible that a level of narcotics and pain can render statements involuntary. (*Id.* at p. 17.) We need not resolve the question of whether the narcotic effect of defendant's medications in this case rendered his statements involuntary because the evidence establishes that even if his statements were erroneously admitted, their effect was harmless.

Any impact on the jury from defendant's statements in the hospital to Sacramento County Police Detective Jason Kirtlan, paled by comparison to the other evidence in the case that established defendant as an accomplice in Gibson's murder. Defendant denied any involvement in Gibson's murder. Defendant stated he remembered being shot somewhere in San Francisco, but could not remember the details. He denied having gunshot residue on his hands. In short, defendant's statements to the police did not connect him with the attempted robbery but gave only a groggy and vague account of being shot somewhere in San Francisco.

By contrast, defendant's leg wound spoke for itself. The wound for which defendant was treated in the hospital matched the wound on the limping suspect in the surveillance video taken from the scene of the murder. The bullet fragments were consistent with the type of bullets fired by Gibson's gun. Defendant's cellphone traveled to Sacramento and then back to the Bay Area on a timeline that corresponded with the timing of the murder. Defendant's denials of involvement in Gibson's murder were, in comparison, relatively unimportant to the prosecution's case. At most, the statements showed defendant did not tell a coherent story about how he was shot. In any event, defense counsel effectively cross-examined Detective Kirtlan to establish defendant was interviewed shortly after surgery at a time when he was groggy and frequently nonresponsive.

Considering the evidence as a whole, the possible exclusion of defendant's responses to Detective Kirtlan while in the hospital would not have made a difference in the outcome. The other evidence of defendant's participation in the attempted robbery/murder of Gibson was compelling. Consequently, any shortcoming by defendant's trial attorney regarding defendant's hospital statements was nonprejudicial. Based on the nonprejudicial nature of the claimed deficiency, the trial court did not err in denying defendant's *Marsden* motion.

(ECF No. 14-1 at 18-22.)

A defendant has a Sixth Amendment right to conflict-free representation. Wood v.

20

1   <u>Georgia</u>, 450 U.S. 261, 271 (1981); <u>United States v. Moore</u>, 159 F.3d 1154, 1157 (9th Cir. 1998).

2   But not every conflict between a criminal defendant and his counsel implicates this right.  <u>Schell</u>

3   <u>v. Witek</u>, 218 F.3d 1017, 1027 (9th Cir. 2000) (en banc); <u>see also</u> <u>Morris v. Slappy</u>, 461 U.S. 1,

4   13-14 (1983) (holding that the Sixth Amendment does not guarantee "a right to counsel with

5   whom the accused has a 'meaningful attorney-client relationship'").  The Ninth Circuit stated that

6   it is "not aware" of "any Supreme Court case suggesting the Sixth Amendment is violated when a

7   defendant "disklike[s] or distrust[s]" his counsel.  <u>Carter v. Davis</u>, 946 F.3d 489, 508-09 (9th Cir.

8   2019) (quoting <u>Plumlee v. Masto</u>, 512 F.3d 1204, 1211 (9th Cir. 2008) (en banc)).  To request a

9   substitution of counsel, a criminal defendant may file a <u>Marsden</u> motion arguing that his

10   counsel's representation has "in some significant measure fallen below the level required by the

11   Sixth Amendment."  <u>Schell</u>, 218 F.3d at 1021.  The question before this federal habeas court is

12   whether the trial court's error "actually violated [petitioner's] constitutional rights in that the

13   conflict between [petitioner] and his attorney had become so great that it resulted in a total lack of

14   communication or other significant impediment that resulted in turn in an attorney-client

15   relationship that fell short of that required by the Sixth Amendment."  <u>Schell</u>, 218 F.3d at 1026.

16       Petitioner claims that the state court's denial of his <u>Marsden</u> motion was an error because

17   his counsel's failure to file a motion to suppress his pretrial statements constituted ineffective

18   assistance of counsel.  To state an ineffective assistance of counsel claim, a defendant must show

19   that (1) his counsel's performance was deficient, falling below an objective standard of

20   reasonableness, and (2) his counsel's deficient performance prejudiced the defense.  <u>Strickland v.</u>

21   <u>Washington</u>, 466 U.S. 668, 687-88 (1984).  For the deficiency prong, "a court must indulge a

22   strong presumption that counsel's conduct falls within the wide range of reasonable professional

23   assistance; that is, the defendant must overcome the presumption that, under the circumstances,

24   the challenged action 'might be considered sound trial strategy.'"  <u>Id.</u> at 689 (citation omitted).

25   For the prejudice prong, the defendant "must show that there is a reasonable probability that, but

26   for counsel's unprofessional errors, the result of the proceeding would have been different.  A

27   reasonable probability is a probability sufficient to undermine confidence in the outcome."  <u>Id.</u> at

28   694.  "The standards created by <u>Strickland</u> and § 2254(d) are both 'highly deferential,' and when

1  the two apply in tandem, review is 'doubly' so." <u>Richter</u>, 562 U.S. at 105 (internal citations

2  omitted); <u>see also</u> <u>Landrigan</u>, 550 U.S. at 473.  When § 2254(d) applies, the "question is whether

3  there is any reasonable argument that counsel satisfied <u>Strickland's</u> deferential standard."

4  <u>Richter</u>, 562 U.S. at 105.

5       The state court's determination that, even if his statements were erroneously admitted, the

6  effect was not prejudicial was not objectively unreasonable.  (ECF No. 14-1 at 21.)  The trial

7  court held a <u>Marsden</u> hearing outside the presence of the prosecutor and listened to petitioner's

8  complaints about his appointed counsel.  (ECF No. 14-1 at 19; <u>see also</u> ECF No. 12 (sealed

9  <u>Marsden</u> hearing transcript)).  After reviewing the record, the state court concluded that "[a]ny

10  impact on the jury from defendant's statements in the hospital to Sacramento County Police

11  Detective Jason Kirtlan, paled by comparison to the other evidence in the case that established

12  defendant as an accomplice in Gibson's murder."  (<u>Id.</u> at 21.)  The evidence of petitioner's guilt

13  was significant, including a leg wound matching the limping suspect from the surveillance

14  footage of the crime scene, bullet fragments from that wound were consistent with the type of

15  bullets fired from Gibson's gun, and petitioner's cellphone data shows travel to and from

16  Sacramento that corresponds to timing of the crime.  (<u>Id.</u>)  In contrast, as the state court noted,

17  petitioner's pretrial statements "did not connect him with the attempted robbery but gave only a

18  groggy and vague account of being shot somewhere in San Francisco."  (ECF No. 14-1 at 21;

19  ECF No. 14-10 at 223-33, 245; ECF No. 14-15 at 54-62 (transcript of pretrial statements)); <u>see</u>

20  <u>Gray v. Gomez</u>, 84 F. App'x 756 (9th Cir. 2003).  Even so, the state court noted that defense

21  counsel effectively cross-examined Detective Kirtlan, establishing that during the interview,

22  petitioner was in the post-operative recovery room, medicated, groggy, and at times not

23  responsive.  (ECF No. 14-1 at 21-22; ECF No. 14-10 at 244-45.)  The fact that petitioner

24  disagreed with his counsel's decision not to file a suppression motion does not mean there was a

25  complete breakdown in communication.  <u>See</u> <u>Carter</u>, 946 F.3d at 507-08; <u>Stenson v. Lambert</u>, 504

26  F.3d 873, 886 (9th Cir. 2007).  This Court concludes that the state court's determination that

27  counsel's performance was not prejudicial and, as a result, the trial court did not err in denying

28  petitioner's <u>Marsden</u> motion, was not objectively unreasonably, and recommends denying habeas

1    relief on this claim as well.

2          D.  <u>Claim Four: Prosecutorial Misconduct</u>

3          Lastly, petitioner claims that the prosecutor misrepresented the evidence in closing

4    arguments in three ways: (1) petitioner changed his clothes before arriving at the hospital; (2) the

5    bullet fragments recovered from petitioner's wounds matched the victim's gun; and (3) the

6    argument before the shooting was from a drug deal gone bad. (ECF No. 1 at 33-37.)  He claims

7    that arguing facts not in evidence constituted prosecutorial misconduct and violated the Sixth

8    Amendment guarantees to cross-examination and confrontation and Fourteenth Amendment right

9    to due process, warranting habeas relief.  (<u>Id.</u>)  Petitioner also argues that defense counsel

10   provided constitutional deficient assistance of counsel by failing to object to the challenged

11   misconduct.  (ECF No. 1 at 35-36.)  In response, respondent contends that relief is barred both for

12   lack of objection and because the state court reasonably determined that the prosecutor's closing

13   arguments were proper.  (ECF No. 13 at 23-28.)

14         The state appellate court denied relief, finding that the claim was procedurally defaulted,

15   and that the prosecutor's argument invited the jury to make reasonable inferences from the

16   evidence.

17   Defendant contends the prosecutor engaged in misconduct during
     closing argument by misrepresenting the evidence presented at trial.
18   He recognizes his trial attorney did not object to the prosecutor's
     comments. Thus, defendant claims he received ineffective assistance
19   of counsel for the lack of objection. We are not persuaded.

20                                              **A.**

21              ***Prosecutorial Misconduct in the Absence of Timely Objection***

22   Misconduct by the prosecution during trial requires reversal of a
     conviction "when it infects the trial with such unfairness as to make
23   the conviction a denial of due process." (*People v. Morales* (2001)
     25 Cal.4th 34, 44 (*Morales*).) Prosecutors have "wide latitude to
24   draw inferences from the evidence presented at trial," however,
     "mischaracterizing the evidence is misconduct." (*People v.
25   Hill* (1998) 17 Cal.4th 800, 823.) A timely objection is necessary to
     preserve a challenge based on prosecutorial misconduct. (*Morales,
26   supra,* at pp. 43-44.) Defendant's claim has not been preserved for
     appeal because there was no objection at trial on the basis of
27   prosecutorial misconduct. To escape forfeiture of this issue,
     defendant argues he received ineffective assistance of counsel in that
28   his trial attorney failed in his duty to object to the claimed

                                              23

misconduct.

As we have noted above, a defendant can prevail on a claim of ineffective assistance of legal counsel if he or she can demonstrate that this attorney's performance fell below an objective standard of reasonableness *and* he or she suffered prejudice as a result. (*Strickland, supra,* 466 U.S. at p. 688.) In reviewing a claim of constitutionally defective representation, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*People v. Maury* (2003) 30 Cal.4th 342, 389.)

Defendant bears a substantial burden in demonstrating ineffective assistance for failure to object to closing argument by the prosecutor. This is because, "[g]enerally, failure to object is a matter of trial tactics as to which we will not exercise judicial hindsight. (*People v. Lanphear* (1980) 26 Cal.3d 814, 828.) 'When a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation. If the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation" (*People v. Pope* [ (1979) 23 Cal.3d 412, 426] ), the contention must be rejected.' (*People v. Jackson* [ (1990) ] 49 Cal.3d [1170,] 1188.) A reviewing court will not second-guess trial counsel's reasonable tactical decisions." (*People v. Kelly* (1992) 1 Cal.4th 495, 520.)

### B.

### *Comments During the Prosecutor's Closing Argument*

#### 1. *Change of Clothes*

Defendant contends the prosecutor misrepresented the evidence at trial by urging the jury to find defendant demonstrated consciousness of guilt after the shooting by changing his clothes before he went to the hospital. Specifically, defendant points to the following statement by the prosecutor to the jury:

"And His Honor is also going to tell you if the Defendant tried to hide evidence, that conduct may show that he was aware of his guilt. [¶] As an example of this, the People would submit, is the trousers. You saw the pictures of the clothing that was cut off [defendant] at the hospital. White pants aren't there. He actually changed clothes before he showed up at San Francisco General Hospital. Whatever happened to those white pants? [¶] Well, he knew that was not a wise thing to bring into a place that might ultimately report his injury to law enforcement, so he took the precaution of actually changing his trousers before he showed up at the hospital. And, as we know, he's showing up in a different car, too. [¶] All of these things are evidence of a consciousness of guilt. It's basically common sense distilled and you, as jurors—as triers of fact, can use it for those purposes."

These statements to the jury by the prosecution were fair comments

24

on the evidence presented at trial. A surveillance camera showed that the passenger in the red racing stripe BMW was wearing white pants when crossing the Carquinez Bridge heading toward Sacramento shortly before the murder. Surveillance video from the scene of the murder showed defendant running in white pants with an injury to his leg. Defendant got into the red racing stripe BMW and headed back to the Bay Area. However, when defendant was admitted into the San Francisco General Hospital, he was wearing black shorts.

"Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial. *(People v. Lucas* (1995) 12 Cal.4th 415, 473.) Whether the inferences the prosecutor draws are reasonable is for the jury to decide." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) Here, a reasonable inference based on the evidence at trial is that defendant changed his clothes after the murder and before he went to the hospital. In suggesting a change of clothes after the murder but before defendant's hospital admission, the prosecutor did not misstate the facts or go beyond the record. (*Ibid.*)

### 2. *Bullet Fragment Match*

Defendant next argues the prosecutor engaged in misconduct by arguing to the jury that the bullet fragments taken from defendant's leg wound "matched" the gun used by Gibson at the time of his murder. Specifically, defendant points to the prosecution's rhetorical question: "What do you think the chances are that you've got a bullet in your leg that matches [Gibson]'s gun?" We are not persuaded. Viewed in context, the prosecutor's comment encompassed the following statements to the jury on surrebuttal:

"I'm just going to deal with some of the arguments [defense counsel] dealt with, in terms of looking at specific items of evidence. And, again, I'm not going to talk about all of them but, for example, he argues with regard to the ballistics, what it does and does not mean and, for example, he points out that [the prosecution's ballistics expert] could not identify the bullet from the [defendant's] leg as having been fired from [Gibson]'s gun. [¶] *That's quite true. It's an accurate statement of fact* but, again, that's explaining away one item of evidence. [¶] What do you think the chances are that you've got a bullet in your leg that matches [Gibson]'s gun? And we have a similar situation with a bullet that's actually found in Jason Brown's car and you've got the Defendant's DNA in that car. I could go on and on but you get the idea." (Italics added.)

The prosecutor did not commit misconduct by misrepresenting the evidence at trial. To the contrary, the context of the prosecutor's comment shows an express acknowledgment of the "accurate statement of fact" regarding the bullet fragments by defendant's trial attorney. Defendant's objection to the prosecutor's use of the word "match" to describe the relationship between the bullet fragments and the rifling characteristics of Gibson's gun draws a distinction without a meaningful difference. It might have been more accurate to refer to the ballistics expert's testimony as showing the bullet fragments from defendant's leg as "not inconsistent" with the rifling characteristics of Gibson's gun. However, coming immediately after

25

an express acknowledgment of the accuracy of defense counsel's assertions regarding the bullet fragments, we perceive no error by the prosecutor. Certainly, the jury had the means by which to evaluate the evidence regarding the bullet fragments because jurors themselves heard the testimony of the ballistics expert.

### 3. *Drug Deal Gone Bad*

Defendant next argues the prosecutor mischaracterized the evidence at trial by arguing "that [T.G.] said the incident involved a soured drug deal." In particular, defendant focuses on the following statement of the prosecutor to the jury: "This was, as [T.G.] explained, a drug deal gone bad. That's what it was. These people tried to rip [Gibson] off of his dope, he was armed, he was prepared to resist, he tried to resist, and they gunned him down in consequence."

As defendant notes, T.G. did not testify that this was a drug deal. However, T.G. did testify that -- based on her observations -- the interaction between Gibson and the other men "sounded like a deal gone bad." The evidence also showed Gibson told his wife he was going to the shopping center to sell marijuana. And Gibson took about two pounds of marijuana with him. Taken together, these facts supported the reasonable inference the incident was a drug deal that had gone bad.

In sum, all of the three statements to the jury by the prosecutor to which defendant now objects for the first time on appeal were fair comments on the evidence. Defendant's trial attorney was not ineffective for failure to object to the three statements because the statements were well within the prosecutor's wide latitude to draw reasonable inferences from the evidence at trial.

(ECF No. 14-1 at 22-27.)

As a threshold matter, respondent argues that petitioner's claim is procedurally barred. Although procedural issues are often addressed before the merits, they need not be. The Supreme Court in Lambrix v. Singletary, 520 U.S. 518 (1997) skipped over the procedural bar argument and proceeded to the merits. Id. at 525 ("Despite our puzzlement at the Court of Appeals' failure to resolve this case on the basis of procedural bar, we hesitate to resolve it on that basis ourselves."); see also Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) (stating that courts may "reach the merits of habeas petitions if they are, on their face and without regard to any facts that could be developed below, clearly not meritorious despite an asserted procedural bar."). "Procedural bar issues are not infrequently more complex than the merits issues" and "it may well make sense in some instances to proceed to the merits if the result will be the same."

1   Franklin, 290 F.3d at 1232; see, e.g., Dean v. Schriro, 371 F. App'x 751 (9th Cir. 2010).  Because

2   this claim can be resolved on the merits, this Court declines to decide whether a procedural bar

3   precludes petitioner from obtaining habeas relief.

4       On the merits, when reviewing the prosecutor's alleged misconduct, "[t]he relevant

5   question is whether the prosecutors' comments 'so infected the trial with unfairness as to make

6   the resulting conviction a denial of due process.'"  Darden v. Wainwright, 477 U.S. 168, 181

7   (1986) (Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); see also Parker v. Matthews, 567

8   U.S. 37, 45 (2012) (per curiam).  "[I]t 'is not enough that the prosecutors' remarks were

9   undesirable or even universally condemned.'"  Darden, 477 U.S. at 181 (citation omitted).  In

10  making its determination, the court should consider the prosecutor's comments in the context of

11  the entire trial record.  Hein v. Sullivan, 601 F.3d 897, 912–13 (9th Cir. 2010).  "[T]he Darden

12  standard is a very general one," and courts, therefore, have "'more leeway . . . in reaching

13  outcomes in case-by-case determinations.'"  Parker, 567 U.S. at 48 (quoting Alvarado, 541 U.S.

14  at 664).  Even if there was prosecutorial misconduct, habeas relief is only warranted if petitioner

15  can establish that the error "'had substantial and injurious effect or influence in determining the

16  jury's verdict.'"  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (citation omitted); see also

17  Parle v. Runnels, 387 F.3d 1030, 1044 (9th Cir. 2004).

18      Here, petitioner challenges three comments made by the prosecutor during closing and

19  rebuttal arguments.  During closing argument, prosecutors have wide latitude, including the

20  freedom to argue reasonable inferences based on the evidence.  United States v. Molina, 934 F.2d

21  1440, 1445 (9th Cir. 1991); see Jackson v. Ratelle, 990 F.2d 1258 (9th Cir. 1993).  After

22  reviewing the evidence, this Court agrees with the state court that the prosecutor did not misstate

23  the facts or record.  First, petitioner claims that the prosecutor improperly argued that petitioner

24  changed clothes after being shot, showing consciousness of guilt.  (ECF No. 14-12 at 140-41.)

25  The record does not support petitioner's claim. There was evidence that the passenger of the red

26  racing stripe BMW was wearing white pants when he crossed a bridge heading towards

27  Sacramento, that the suspect at the crime scene was running in white pants with an injured leg,

28  and that petitioner traveled back to the Bay Area, but was admitted to the hospital with black

1    shorts.  (ECF No. 14-1 at 24.)  The state court, therefore, reasonably concluded that "a reasonable

2    inference based on the evidence at trial is that the defendant changed his clothes after the murder

3    and before he went to the hospital."  (Id. at 25.)

4         Second, petitioner contends that the prosecutor misstated the evidence by claiming there

5    was a match between the bullet fragments recovered from his leg and the victim's gun.  When

6    viewed in the context of the trial record, this Court agrees with the state court that his statement

7    does not arise to prosecutorial misconduct.  (ECF No. 14-12 at 26.)  The prosecutor also

8    acknowledged that the expert's conclusion that the bullet fragments had "[g]ood agreement of

9    class characteristics rifling but insufficient for identification." (ECF No. 14-12 at 136.)  In

10   rebuttal argument, prosecutor admitted that it is an accurate statement of fact that the expert could

11   not identify the bullet from petitioner's leg as having been fired from the victim's gun.  (Id. at

12   180; see also ECF No. 14-12 at 156 (defense counsel arguing that bullet fragments could have

13   come from the victim's weapon or "thousands of other guns that had that same kind of class

14   characteristics."))  Lastly, petitioner argues that prosecutor created facts by claiming that Garza

15   testified that the shooting resulted from a drug deal gone bad.  (See ECF No. 14-12 at 187 ("This

16   was, as Mr. Garza explained, a drug deal gone bad.  That's what it was.  These people tried to rip

17   Mr. Gibson off of his dope, he was armed, he was prepared to resist, he tried to resist and they

18   gunned him down in consequence."))  It was objectively reasonable for the state court to reject

19   this argument as well.  As the state court noted, Garza testified that the argument was between

20   two angry men and sounded "like a deal gone bad."  (ECF No. 14-11 at 57-58.)  The victim's

21   wife testified that the victim left that evening to make a marijuana sale in Walmart parking lot.

22   (ECF No. 14-10 at 93.)  The state court concluded that "these facts supported the reasonable

23   inference the incident was a drug deal that had gone bad."  (ECF No. 14-1 at 26-27.)

24        This Court concludes that the state court's rejection of petitioner's prosecutorial

25   misconduct claim was not contrary to, or an unreasonable application of, clearly established

26   federal law, or that such a finding was based on an unreasonable application of the facts, and

27   recommends denying habeas relief on the claim.

28   ////

VI.  Request for Appointment of Counsel

In his traverse, petitioner requests appointment of counsel.  (ECF No. 20 at 9.)  There currently exists no absolute right to appointment of counsel in habeas proceedings.  See Nevius v. Sumner, 105 F.3d 453, 460 (9th Cir. 1996). However, 18 U.S.C. § 3006A authorizes the appointment of counsel at any stage of the case "if the interests of justice so require."  See Rule 8(c), Fed. R. Governing § 2254 Cases.  In the present case, this Court does not find that the interests of justice would be served by the appointment of counsel at the present time.

VII.  Conclusion

Accordingly, IT IS HEREBY ORDERED that petitioner's request for appointment of counsel (ECF No. 20) is denied without prejudice; and

IT IS RECOMMENDED that petitioner's application for a writ of habeas corpus (ECF No. 1) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  May 25, 2023

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

2